## Kentucky Independent Oil Company v. Schnitzler, Administrator.

(Decided April 24, 1925.)

## Appeal from Kenton Circuit Court.

1. Negligence—Manufacturer Concealing Defect Liable to Injured Consumer.—Though generally a manufacturer or seller of defective articles is not liable for injuries to an ultimate consumer who has purchased from a middleman, where manufacturer knows that article is dangerous, due to defect in its construction, and conceals such defects, he is liable to consumer for injuries from such defect.

2. Negligence—Manufacturer Liable for Injury from Inherently Dangerous Article Marketed Without Warning.—Though generally a manufacturer of a defective article is not liable for injuries to ultimate consumer, who has purchased from a middleman, where manufactured article is inherently dangerous, manufacturer is liable to ultimate consumer from injuries which result from manufacturer's negligence in putting such article on the market without due warning.

3. Explosives—Negligence of Grocer Selling Mixture of Gasoline and Kerosene Delivered by Defendant Does Not Absolve Defendant from Liability for Injury to Consumer, Unless Grocer's Negligence was Intervening Cause.—Where defendant's agent mixed gasoline and kerosene when delivering it to a grocer, and latter resold it, resulting in consumer being burned to death by explosion while starting a fire, negligence or knowledge of grocer does not absolve defendant from liability, except in so far as grocer's negligence or knowledge was intervening cause.

4. Negligence—Intervening Tort of Second Person does Not Absolve First from Liability.—Fact that a second human actor, not acting in concert with a first, intervenes with a tortious act, which begins later in time to that of first actor, and which second act is only force in active motion at time of damages, does not absolve

first actor from liability, if first actor foresaw or could have foreseen commission of second's tort.

5. Explosives—Defendant Delivering Mixture of Gasoline and Kerosene to Grocer, who Resold it, Held Liable for Death of Consumer from Explosion, Notwithstanding Grocer's Gross Negligence in Reselling Mixture.—Where defendant's agent delivered mixture of gasoline and kerosene to a grocer, who with alleged knowledge thereof resold it to plaintiff's decedent, and latter was killed by an explosion, while starting a fire, held that grocer's act in selling such mixture did not amount to willful misconduct, but at most gross negligence, and, as defendant should have foreseen probability that grocer would resell such mixture, defendant is not absolved from libaility because of grocer's alleged negligence.

6. Pleading—Allegation in Petition as to Alleged Gross Negligence of Another than Defendant Held Immaterial, and Surplusage Not Rendering Petition Subject to Demurrer.—In action for death of plaintiff's decedent by explosion of mixture of gasoline and kerosene which defendant's agent had delivered to grocer, who resold it to plaintiff's decedent, since grocer's alleged gross negligence in reselling such mixture did not absolve defendant from liability, allegation in plaintiff's petition as to grocer's negligence was immaterial and surplusage, and did not render petition subject to demurrer.

7. Trial—Immaterial Allegation in Plaintiff's Petition as to Negligence of Another than Defendant Held Not to Render Jury's Finding for Plaintiff Contrary to Law.—In action for death of plaintiff's decedent by explosion of mixture of gasoline and kerosene which defendant's agent had delivered to grocer, who resold it to plaintiff's decedent, where evidence warranted jury in finding that grocer did not know of dangerous character of mixture, jury's finding under an instruction which made grocer's knowledge a sine qua non for verdict for plaintiff is not contrary to law, because of presence in plaintiff's petition of immaterial allegation as to grocer's negligence in reselling such mixture, since such immaterial allegation could not effect a variance between the allegation and proof.

8. Trial—Jury Not Bound by Immaterial Allegation which did Not Bind Pleader, where such Allegation could Not Result in Variance. —In action against defendant for death of plaintiff's decedent by explosion of mixture of gasoline and kerosene which defendant's agent had delivered to grocer, who resold it to plaintiff's decedent, where allegation in plaintiff's petition as to grocer's knowledge of character of mixture was immaterial, and could not effect a variance, jury was not bound to find that grocer had knowledge rather than he was ignorant, even though instructed that grocer's ignorance was prerequisite to recovery against defendant.

9. Negligence—Omission of Third Person to Interrupt Result of Defendant's Act Not Intervening, Efficient Cause Relieving De-

fendant.—Where defendant's agent delivered a mixture of gasoline and kerosene to a grocer, who with alleged knowledge thereof sold it to plaintiff's decedent, and latter was killed by an explosion while starting a fire, failure of grocer to warn plaintiff's decedent, after he had discovered dangerous character of mixture he was selling, was not such an intervening, efficient cause as to relieve defendant from liability.

10. Explosives—Admission of Evidence of Custom of Starting Fire with Kerosene Held Not Prejudicial.—In action for death of plaintiff's decedent by explosion of mixture of gasoline and kerosene, which defendant's agent had delivered to a grocer, who resold it to plaintiff's decedent, admission of evidence as to custom in neighborhood of starting fires with kerosene was not prejudicial in view of common knowledge of that fact, and court's instruction precluding recovery if decedent was careless in manner of starting fire.

11. Evidence—Evidence Held Sufficient to Warrant Admission of Samples of Kerosene Purchased by Neighbors to Show that Kerosene Purchased by Decedent was Mixture of Kerosene and Gasoline.—In action for death of plaintiff's decedent by explosion of mixture of gasoline and kerosene which defendant's agent had delivered to a grocer, who resold it to plaintiff's decedent, evidence as to whether samples of kerosene bought by neighbors was taken from same tank as that furnished plaintiff's decedent held sufficient to warrant admission of such samples in evidence for purpose of showing that article purchased by plaintiff's decedent was dangerous.

12. Explosives—Contributory Negligence in Starting Fire with Mixture of Gasoline and Kerosene Question for Jury.—In action for death of plaintiff's decedent by explosion of mixture of gasoline and kerosene which defendant's agent had delivered to a grocer, who resold it to plaintiff's decedent, where there were no eyewitnesses to explosion, whether or not decedent was guilty of contributory negligence in method of starting fire was question for jury.

13. Death—$13,666.66 Damages Held Not Excessive.—Award of $13,666.66 for death of plaintiff's decedent, who was earning $130.00 a month, was in sound health, and had an expectancy of at least 25 years, was not excessive.

MACKOY & MACKOY for appellant.

R. G. WILLIAMS and O. M. ROGERS for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

Thomas Burnside had for a long time conducted a country store at Visalia, a hamlet in Kenton county,

Kentucky, from which he sold coal oil to his trade. For that purpose he had in a row just outside the door of his store three cylindrical tanks of fifty-five gallons capacity each. Burnside handled no gasoline and only kerosene of the best grade which he purchased from both the Standard Oil Company and the Kentucky Independent Oil Company, appellant herein. This oil was delivered to him by these companies from tank wagons. On October 12, 1921, the appellant, through a driver, new to the route, sold and delivered to Burnside without dispute thirty-five gallons of high grade kerosene and twenty gallons of gasoline as contended by Burnside, and of low grade kerosene as contended by the appellant. Whether or not this was kerosene or gasoline was a disputed issue in this case and the jury by its verdict, as hereinafter noted, having found it to be gasoline we must accept as a fact this finding. This delivery of gasoline was made by the driver of appellant without the authority or previous knowledge of Burnside, who had simply told him to fill the tanks with whatever was necessary to fill them. The driver carried out these instructions by pouring the undisputed thirty-five gallons of high grade kerosene into the first tank and the twenty gallons of gasoline into the second or middle tank, so filling them, there being at this time thirty-five gallons of kerosene in the middle tank. When Burnside discovered, as he immediately did when the driver came into the store to get his dray tickets signed, that gasoline had been poured into the middle tank, he demanded that the driver at once remove the same. This is another disputed question in the case, but the jury found this also to be a fact and it must be so accepted. These tanks were filled at the top and were emptied through a faucet at the bottom. The driver did then remove through this faucet at the bottom twenty gallons of liquid from the middle tank. Although the evidence in this case discloses without contradiction that kerosene and gasoline will mix, yet no witness places the period necessary for such mixture at so short a time as elapsed between the pouring in of the gasoline at the top and the removal of the twenty gallons of liquid at the bottom by the driver here. After the driver had removed thus the twenty gallons of liquid, he refilled the middle tank with twenty gallons of kerosene of a lower gravity than that of the kerosene he had poured into the first tank, and then told Burnside that if he had not removed all the gasoline he had poured into the tank, which

he thought he had done, this lower gravity kerosene would make the mixture in the tank harmless. Burnside testified he relied upon this assurance of the driver. The evidence is convincing that appellant knew that Burnside was engaged in the grocery business, and it is equally as convincing that the appellant knew that the supplies of kerosene sold by it to Burnside were by Burnside to be resold to his trade. Hence they are charged with notice that this mixture of kerosene and gasoline created in the middle tank by their driver might be retailed by Burnside to his customers. The evidence further discloses that Burnside did retail after October 12th the contents of this middle tank to his trade, and no doubt some of the contents of the first tank which had also been filled by appellant on October 12th. On October 15th, Burnside sold to appellee's decedent, whose home was next door to this store, two gallons of the mixture which he thought to be coal oil from this middle tank. On October 19th he made another like sale to decedent. In the early hours of October 21st, decedent, according to his usual custom, started the morning fire in the kitchen stove. The decedent's daughter had laid this fire the night before, as she always did, by putting paper and kindling wood in the grate and the coal on top of the stove. This stove was a six lid affair that stood on legs with an open grate. In starting the fire, decedent, as he had often done theretofore, made use of the kerosene. There were no eye-witnesses to the tragedy which ensued, but very shortly after the decedent went into the kitchen a terrific explosion was heard and he came running from the house literally covered from his neck to his shoes with a burning substance. He was burned so badly that in a couple of hours he died. The house itself was destroyed but the stove and oil can were found, the former with its lids blown off and the latter with its top blown off. It appears that a few days prior to the 21st, a great many of the neighbors who traded with Burnside were having trouble with what they had bought from him as kerosene. Their lamps would explode and when they started their fires with the oil, there was a shooting up of the flame which indicated that the mixture being used was dangerous. In fact one of the neighbors went to Burnside the evening before decedent was burned and warned him of the condition of the kerosene he was selling. Burnside at once looked into his middle tank and, as he says, discovered from its smell and otherwise that

it was nearly all gasoline, whereupon he closed up said tank and made no more sales therefrom. He, however, did not warn his customers and especially the decedent or any of his family of what he had discovered, because, as he says, he did not know just who had bought coal oil from him, and in so far as the decedent was concerned, he had tried to warn him but he was not at home. There were introduced on the trial samples of the kerosene which the neighbors had bought. These samples disclosed a very low ''fire point,'' indicating that the mixture had present in it a large amount of gasoline. The appellee as administrator of the decedent brought this suit originally against both Burnside and the appellant to recover damages for his decedent's death, but he later dismissed the suit as to Burnside and prosecuted it alone as to appellant.

The jury returned a verdict in favor of appellee in the sum of $13,166.66, and from the judgment entered thereon appellant appeals.

It is first insisted for appellant that the lower court erred in overruling its demurrer to appellee's petition as amended, and since appellant practiced this case throughout on the theory it entertained of the validity of its demurrer we will first address ourselves to its consideration.

Again are we confronted with the question of the liability of a manufacturer or packer of a defective article for injury to the person of an ultimate consumer who purchased from a middleman. It is of course the general rule that a manufacturer or seller of a defective article is not liable for injuries to the person of an ultimate consumer who has purchased from such middleman. See Peaslee-Gaulbert v. McMath's Administrator, 148 Ky. 265, 146 S. W. 770. But to this general rule there are exceptions. Among them is where the manufacturer knows the article he has made and which is not inherently or intrinsically dangerous to health or life, is nevertheless unsafe and dangerous due to defects in its construction or material, and either conceals the defects or represents the article as safe and sound, in which state of case he is liable to the ultimate consumer who may be injured due to such defect. Old's Motor Works v. Shaffer, 145 Ky. 616, 140 S. W. 1047. The theory underlying liability in this class of cases seems to rest upon the idea of false representations in the nature of deceit, and hence

when the middleman knows the article is unsafe or dangerous and then resells it, the ultimate consumer cannot recover from the manufacturer, since the basis of liability, *i. e.,* deceit, is lacking. Old's Motor Works v. Shaffer, *supra.*

Another exception to the general rule of nonliability is where the article manufactured is inherently or intrinsically dangerous to life and limb, and in this class of cases the manufacturer is liable to the ultimate consumer for injuries which result from the manufacturer's negligence in manufacturing or packing or putting upon the market without due warning such article. The liability here does not arise out of contract or deceit but is based upon the fundamental proposition that where a person sustains such relations to society that danger to others will result from a failure to use due care in his activities, he owes the legal duty of such care to that class of persons likely to be injured by his failure to exercise it. One who puts on the market articles inherently or intrinsically dangerous to life owes the duty of care to all those persons who ought reasonably to have been foreseen as likely to use them. And such an article is a mixture of gasoline and kerosene. Waters-Pierce Oil Co. v. Deselms, 212 U. S. 159. An exhaustive note collecting the authorities in support of this proposition may be found in 17 A. L. R. 683, et seq., and at page 689 may be found the cases covering sales of a mixture of gasoline and kerosene for kerosene as in the case at bar. Under this exception to the general rule falls the case before us, and there could be no question of the liability of appellant to the ultimate consumer for injuries resulting from the inherently and intrinsically dangerous mixture created by its agent and which it knew would be by the middleman resold to the ultimate consumer but for the fact that in the petition as amended it is alleged that, when the mixture was made by the driver, Burnside knew of it and thereafter, "with gross and wanton carelessness or negligence," resold it to the decedent. Although the evidence shows that Burnside did not know of the dangerous character of the mixture at the time he resold it to the decedent, since he had been assured by appellant's driver that the gasoline had been removed, yet appellant insists that appellee is bound by the averments of his petition, and that the finding of the jury for appellee under an instruction that they could do so only

if Burnside was ignorant of the character of the mixture sold appellee's decedent, is contrary to law, since the jury was also bound by the averment to the contrary in the petition. As above stated, liability in a case of this character does not rest in contract or deceit, in which state of case, as we have seen, the knowledge of the middleman of the defect releases the manufacturer from liability to the ultimate consumer. Liability here rests on the duty owed by the manufacturer to the class of persons likely to be injured by his failure to exercise ordinary care in his activities where danger to them will probably result from such failure. Hence the negligence or knowledge of Burnside can have no effect to absolve appellant from liability to the ultimate consumer except in so far as such negligence or knowledge breaks the chain of causation, if it does. The problem thus presented for solution is the old problem of proximate cause in actions of tort.

That appellant set in motion forces which ultimately resulted in damage to appellee's decedent of a kind that the law will notice and give redress for must be conceded. Does the fact that a second human actor, not acting in concert with a first human actor, intervenes with a tortious act which begins later in time to a tortious act of the first actor and which second tortious act is the only force in active motion at the time of the damage, exonerate the first actor from liability? Although the second human actor may be liable it does not necessarily follow that the first is exonerated. By the decided weight of authority the first will be liable if he foresaw or ought to have foreseen the commission of the second's tort. Although the earlier view was that the prior tort feasor was never liable where a later tort feasor intervened—see Vicars v. Wilcocks, 8 East. 1 (1806)—yet it has gradually come to be admitted that the earlier tort feasor is liable in cases where the commission of the subsequent unlawful or tortious act and the happening of the damages ought to have been foreseen by him as not unlikely to follow. A leading case supporting this modern view from this jurisdiction is that of Watson v. K. & I. Bridge & R. Co., 137 Ky. 619, 126 S. W. 146, 129 S. W. 341. In this case a carload of gasoline was negligently derailed and the gasoline negligently allowed to escape into the surrounding streets. One Duerr in passing by, lit a cigarette and then threw the match, still lighted, into the gutter where a lot

of gasoline was. An explosion took place. There was some evidence to show that Duerr knew of the presence of the gasoline in the neighborhood and that he maliciously threw the lighted match into it because of his hatred of the railroad, his former employer. This court held that if the act of Duerr was wilful then the railroad was not responsible for the ensuing explosion, but if it was accidental or negligent the railroad was not relieved of responsibility for its prior negligence in the derailment of the car and the escape of the gasoline, since it should have foreseen such an accidental or negligent act on the part of some one which, coupled with its own negligence, would result in the explosion that occurred.

The same rule of law is followed in Louisville Home Telephone Co. v. Gasper, 123 Ky. 128, 93 S. W. 1057. Here the telephone company had placed a guy wire in an alley in such fashion that those driving vehicles through the alley, unless they were careful, might run into such wire. In so doing this court said the telephone company was negligent. A grocery wagon was negligently driven through this alley and upon the guy wire, as a result of which the wagon was overturned and Gasper, a pedestrian, was painfully hurt. The telephone company sought to escape liability on the theory that the intervening negligent act of the driver of the grocery wagon exonerated it from any liability for its prior negligence. This court, in an opinion that went carefully into the authorities, disallowed this contention and held the telephone company liable because it should have foreseen such an accidental or negligent act on the part of some driver, which, coupled with its negligence, would result in injury to some pedestrian. This case is also reported in 9 L. R. A. (N. S.) 548, where a note collecting the authorities in agreement with it may be found.

Though there is no extended discussion of the theory on which it rests, the case of Whiteman-McNamara Tobacco Co. v. Warren, 23 Ky. L. Rep. 2120, 66 S. W. 609, is in line with these authorities. There, the tobacco company negligently allowed hot scalding water to flow into a gutter in a public street from its plant. Warren, a little boy, while walking along the street, was jostled or bumped by some other little boys who pushed him off the walk and into the gutter, where he fell into the scalding water. This court held the tobacco company liable for the injuries which resulted from the scalding.

These authorities and the reasoning upon which they rest are conclusive of the question under discussion. In placing this dangerous mixture in one of a battery of three oil tanks from which the busy keeper of a country store or his clerk might be hurriedly called at any time to fill the can of a customer, with the probability of forgetfulness of the presence of the mixture or which tank it was in ever present, with the mind of such storekeeper distracted by the thousand petty details which press daily upon such a man, appellant should have anticipated and foreseen that Burnside might negligently resell the dangerous mixture sold by it to him for an article the very purpose of which was for resale. Burnside's act did not amount to wilful misconduct. The allegation of wanton carelessness is no more than one of gross negligence. Burnside's act was at the worst, if the allegations in the petition be true, grossly negligent, and as appellant should have foreseen its probability it cannot be relieved from liability for its tortious act because this act of Burnside was grossly negligent. Hence the court did not err in overruling appellant's demurrer to appellee's petition; and as Burnside's ignorance or knowledge of the presence of the mixture and his negligent act in its resale, if it was negligent, were absolutely immaterial so far as appellant's liability in this case is concerned, it follows that the allegation in the petition of Burnside's negligence in the resale of the mixture was an immaterial allegation and hence surplusage, which neither adds nor detracts anything from the pleading. Anderson's Admr. v. Granville Coal Co., 205 Ky. 111, 265 S. W. 472. As the evidence warranted the jury in finding that Burnside did not know of the dangerous character of the mixture he was selling decedent, its finding under an instruction which made such a condition a *sine qua non* for a verdict for appellee is not contrary to law under the case of Lynch v. Snead Architectural Iron Works, 132 Ky. 241, 116 S. W. 693, because of the presence in the petition of the immaterial allegation on which appellant relies. This immaterial allegation could not effect a variance between the *allegata* and *probata*. As well said in the case of James v. Goodenough, 7 Nev. 324, at page 327: "It is sufficient if the proofs correspond with the allegations in respect of those facts and circumstances which are, in point of law, essential to the cause of action. The *allegata* and *probata* need have only a legal identity, and this consists in their agreement in all

the particulars legally essential to support the claim preferred.'' In 31 Cyc. 702, we find: ''Material variance cannot be predicated upon immaterial or superfluous allegations.'' See also Chitty's Pl., pp. 291, 382. Since, then, the immaterial allegation of Burnside's knowledge of the character of the mixture he was selling, could not effect a variance because the proof showed his ignorance of the same, the jury was not bound to find that Burnside had knowledge rather than he was ignorant, as he was. Appellant was not entitled to the instruction predicating relief only on Burnside's ignorance of the mixture, as we have seen, but as the instruction was given, the jury were not bound by an immaterial allegation which never bound the pleader, and the exact proof or even failure of proof of which could not have affected his cause of action.

We therefore conclude that appellant was neither entitled to a peremptory instruction nor to a new trial because of the allegations in the petition concerning Burnside's negligence or knowledge of the character of the mixture he was selling decedent.

Appellant next assigns as error the rejection of testimony offered by it to prove that Burnside made no effort to warn appellee's decedent after it is admitted he had discovered on the day before the tragedy the dangerous character of the kerosene he was selling. That the lower court committed no error in this is clear. The mere omission of a third person to interrupt the result of the defendant's act will not amount to an intervening efficient cause so as to relieve such defendant from liability. 29 Cyc. 502.

It is also urged that the lower court erred in admitting incompetent evidence offered by appellee. The first complaint made in this connection is that the court permitted appellee to show a custom in the neighborhood where this accident happened of the starting of fires with kerosene. The admission of this evidence was not prejudicial because, as well stated in the case of Waters-Pierce Oil Company v. Deselms, *supra*, at page 174, a case very like the one under discussion, the fact that kerosene is generally used for starting fires is one of common knowledge and experience in all communities, and it was not really necessary to offer proof in connection therewith. The jury knew that in starting a fire with kerosene it must be carefully done, and further it was instructed that if appellee's decedent was careless

in the way he used the kerosene in starting the fire he could not recover. It is also complained that the court permitted the appellee to introduce on the trial samples of kerosene bought by the neighbors from Burnside after the mixture had been made, which samples were highly inflammable and dangerous, to show that the article pur- chased by decedent was likewise dangerous, it being con tended that there was not a scintilla of evidence to show that all or any of the samples and decedent's oil came from the same tank. In this appellant is in error. Burn- side testified that after the mixture of the 12th no sales were made except from the middle tank. Although his testimony on this point was somewhat weakened on cross-examination, and although it was shown in evi- dence that after the delivery of the 12th the appellant made a further delivery of twenty-five gallons of ad- mitted kerosene on the 14th, and the Standard Oil of fifteen gallons on the 18th, some of which may have gone into the first tank, thus indicating that some sales had been made from it, yet it is not pretended that the first tank ever contained anything but high grade oil, and the only tank which the evidence shows contained any mix- ture that would likely cause the trouble the neighborhood was complaining of was the middle tank. Further, as soon as complaint was made to Burnside, he investigated the middle tank and found that it did contain gasoline, and all this demonstrates to our minds that the samples and decedent's oil all did come from the same middle tank. Hence it was not error to admit in evidence the samples complained of.

Under the instructions of the court, before the jury could find for appellee, it was incumbent upon it to find that appellee's decedent was killed by an explosion of a dangerous mixture bought by him from Burnside and created by appellant and that the explosion occurred while he was making a fire in the usual way fires are so made by careful and prudent persons, and while he was using ordinary care for his own safety. There was evi- dence in the case that the explosion could have taken place if the mixture was dangerous and appellee was starting the fire, using it in a careful and prudent way that kerosene may be used in starting fires. It was ap- pellant's theory that appellee's decedent was guilty of the grossest contributory negligence in the way he used the mixture in starting the fire. Appellant cites some cases to sustain its contention, but in all of them there

was positive evidence that the person burned was pouring the oil from the can on to live coals, holding the can in close proximity to the fire. There is no such evidence here although there is evidence that the explosion might have occurred had appellee's decedent been so doing. The cases cited by appellant further hold that where there are no eye-witnesses to the explosion, and where the explosion might have occurred, even though the person burned was using ordinary care, whether or not he was guilty of contributory negligence is a matter for the jury, to be by it determined from all the circumstances of the case. Such was the situation here, and the case being submitted to the jury on that theory appellant has no just cause of complaint.

It is last urged that the verdict is excessive. Appellee's decedent at the time of his death was earning not less than $130.00 a month, was in sound health and had an expectancy of at least twenty-five years. It is therefore apparent that the verdict was not excessive. No errors appearing prejudicial to the substantial rights of the appellant, the judgment of the lower court is affirmed.

Judgment affirmed.