CITY OF DEARBORN *v.* BACILA.

1. AUTOMOBILES—CONTRIBUTORY NEGLIGENCE—INTERSECTION—LEFT TURN—FINDING IN NONJURY CASE—EVIDENCE.

> Circuit judge's finding that plaintiff's driver was guilty of contributory negligence when its car collided with defendant's left-turning car at 1 a.m. at a street intersection controlled by a traffic light *held,* sustained by evidence presented in nonjury case, it appearing that plaintiff's driver either had not made observations for other traffic that might enter the intersection ahead of him or that he failed to see the defendant's car at any time prior to the instant of the impact (CLS 1956, § 257.-650).

2. PLEADING—CONTRIBUTORY NEGLIGENCE—AFFIRMATIVE DEFENSE.

> Effective June 1, 1958, the contributory negligence of a plaintiff is deemed to be a matter of affirmative defense to be pleaded and proved by defendant (Court Rule No 23, § 3a, as added April 14, 1958).

Appeal from Wayne; Weideman (Carl M.), J. Submitted January 10, 1958. (Docket No. 38, Calendar No. 47,410.)   Decided June 12, 1958.

Case by the City of Dearborn, a municipal corporation, against Eli Bacila for damages resulting from automobile collision. Judgment for defendant. Plaintiff appeals. Affirmed.

*Dale H. Fillmore,* Corporation Counsel, and *Carl P. Garlow,* Assistant Corporation Counsel, for plaintiff.

*Cary & BeGole (Robert B. Campbell,* of counsel), for defendant.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 5A Am Jur, Automobiles and Highway Traffic §§ 712, 713.

CARR, J. This case has resulted from a traffic accident occurring in the city of Dearborn on the 17th of April, 1955, at approximately 1 o'clock in the morning. On the occasion in question a member of the police department of the city was driving an automobile owned by plaintiff in a northerly direction on Miller road. At the intersection of said highway with Eagle street, or Eagle Pass, the police car collided with an automobile operated by the defendant. Claiming that the latter was at fault in the matter, an action was brought in the municipal court of the city for damages, recovery of the alleged amount thereof in excess of $1,000 being waived. The declaration filed alleged negligence on the part of the defendant in making a left turn without proper observations, and in proceeding against a red light. To the declaration defendant filed a plea of the general issue, reserving therein the right to file at a later date a detailed answer to plaintiff's pleading. It does not appear from the record, however, that this was done. The trial in the municipal court resulted in a judgment for plaintiff, from which defendant appealed.

In the circuit court the parties to the cause waived the right to a jury trial, and the matter was heard before the circuit judge. In support of its claim plaintiff introduced the testimony of the police officer, Harold Monberg, who was driving the automobile, and also produced as a witness another officer who was riding in the car at the time of the accident. At the conclusion of plaintiff's testimony counsel for defendant made a motion for judgment "on the basis of the plaintiff's proofs." In support of said motion it was claimed specifically that Officer Monberg, in the operation of plaintiff's vehicle, failed to make proper observations as he entered the intersection, and prior thereto, that had he exercised due care in such respect he would have been in position to avoid

the accident, and that, in consequence, on the basis of the proofs submitted plaintiff was not entitled to recover. The motion was granted for the reason asserted by defendant's counsel in his motion, and for the further reason that plaintiff had not introduced proof as to the amount of damages sustained by it. Judgment in defendant's favor was entered accordingly, and plaintiff has appealed.

At the time of the accident Miller road was a divided north and south thoroughfare, with 3 lanes for northbound traffic and like provision for southbound traffic. North and south of Eagle Pass the 2 sections of the highway were separated by a so-called island, approximately 8 feet in width. In the center of said intersection was a concrete structure on which was located a traffic light. It may be noted in this connection that the intersection was, at the time of the occurrence in question, protected by 3 signal lights designed to regulate traffic passing through it.

Plaintiff's proofs indicated that the police car approached the intersection at a rate of speed of approximately 35 miles per hour, that Officer Monberg did not decrease said rate as he entered and attempted to pass through the intersection, and that he did not see defendant's car until it appeared directly in front of him in the middle lane for northbound traffic. In view of the manner of disposition of the case the testimony of Officer Monberg becomes of controlling significance. After testifying that as he approached the intersection he noted that the traffic light was red against northbound traffic on Miller road, and that 3 cars were standing at the intersection waiting for the signal to change, the following testimony indicates the situation that the witness claimed existed immediately prior to and at the time of the collision between the cars:

"*Q.* What did you do when you saw these 3 cars waiting for a red light, officer, in front of you, that is?

"*A.* I think, to make it simple, I was about 150 feet behind the intersection. The 3 cars were lined up, stopped for the red light. The light turned green and these 3 cars proceeded on across the intersection on the green light, and I continued my course, going north.

"*Q.* Did these cars start up and proceed through the intersection before you arrived at the intersection?

"*A.* Yes.

"*Q.* So then we now have your car here, with a light green, and 3 cars clear ahead of you. They have gone on beyond you, is that right?

"*A.* Yes.

"*Q.* Now, tell us what happened as you arrived at the intersection?

"*A.* As I entered the intersection on the green light, a car coming south on Miller road made a fast turn in front of me and a collision occurred."

Following an explanation by the witness as to where the cars were at the time of the collision, he continued his testimony as follows:

"*The Court:* The front portion of the plaintiff's car appears to strike the car driven by the defendant, at the right rear wheel, is that right?

"*A.* Yes.

"*Mr. Campbell:* That is correct.

"*Q.* Is that where you remember striking the other car?

"*A.* Approximately there, between the center post and the rear fender there, on the pink car.

"*Q.* Between the center post and the rear fender of the pink car?

"*A.* Yes. That is approximately the way it happened, right here, just about so, and then from the collision our car—

"*Q.* Never mind that at the moment. I just want you to show us, as best you remember, where the point of impact was, and if you don't remember, tell us.

"*A.* That is approximately it.

"*Q.* Now, just before this collision occurred, I believe you testified that the light was green, and you were about here. Now, between the time that—from here to the point where the 2 cars collided, did you at any time see the other car, officer?.

"*A.* No. All I saw from the other car was a blue flash in front of the scout car.

"*Q.* You say an instant, is that right?

"*A.* Yes, just—just an instant. (Witness snaps fingers.)

"*Q.* Now, after this accident, did you have any discussion with the man who was driving the other car?

"*A.* Yes.

"*Q.* Is he here in court today?

"*A.* Yes, he is.

"*Q.* Where is he?

"*A.* The gentleman in the checkerboard sport jacket.

"*Mr. Campbell:* Referring to the defendant, Eli Bacila.

"*Mr. Garlow:* Yes.

"*Q.* Did you discuss how this accident happened, with Mr. Bacila, or did he discuss it with you?

"*A.* I asked him how come he run the red light. He said he thought he had enough time."

The following testimony on cross-examination further tends to explain the situation at the time of the accident, and the basis for the action of the circuit judge in granting defendant's motion at the conclusion of the proofs:

"*Q.* Now, Officer Monberg, when you saw the 3 cars ahead of you on Miller, at the intersection, I believe you testified at that time you were 150 feet back from the intersection, is that right?

"*A.* Approximately 150 feet back from the intersection.

"*Q.* What was your speed at that time?

"*A.* Approximately 35 miles an hour.

"*Q.* What is the speed limit on Miller?

"*A.* 35 miles an hour.

"*Q.* And at about that time the light turned green and the 3 cars ahead of you proceeded, is that correct?

"*A.* Yes, sir.

"*Q.* Were you in the center of the northbound lanes of travel of Miller at that time?

"*A.* Yes, I was in the center lane.

"*Q.* You didn't change lanes?

"*A.* I didn't change lanes.

"*Q.* What was your speed as you entered the intersection of Miller and Eagle Pass?

"*A.* Approximately 35 miles an hour.

"*Q.* Still 35?

"*A.* Yes.

"*Q.* And what was the color of the light for northbound and southbound Miller traffic?

"*A.* It was green.

"*Q.* Now, when was the first time—strike that. You stated that you saw a blue flash, as the other car, is that correct?

"*A.* Yes, the flash of the color.

"*Q.* Was that the first time that you had seen the other car?

"*A.* That is the first time I saw the other car.

"*Q.* And you were already into the intersection at that time?

"*A.* I was in the intersection.

"*Q.* And when you saw the blue flash, what did you do?

"*A.* As soon as I saw the flash, there was a collision.

"*Q.* You didn't put on your brakes?

"*A.* I didn't have time.

"*Q.* You didn't take your foot off the accelerator?

"*A.* Oh, I believe I took my foot off the accelerator, but I don't believe there was any braking.

"*Q.* Did you make any attempt to turn right or left to avoid the collision?

"*A.* I don't really remember if I did or not, because as soon as the collision occurred, we were turned around, and went backwards into a post on the opposite corner.

"*Q.* Now, the other car, which you have identified as a blue flash, was it in the position as you have already indicated on the board,. at the time that you saw it?

"*A.* Just as we—this car came around here. My lights were on, of course, and all I saw was the flash of the car, the blue flash, the color of the car, coming through the intersection. Just at the instant I saw the color of the car, the collision occurred.

"*The Court:* When you say a blue flash, it wasn't a flash, was it?

"*A.* Well, it was the color of the other man's automobile.

"*The Court:* What you saw, then, was a blue automobile in front of you?

"*A.* Yes. The color—the color across the headlights of my car.    *    *    *

"*Q.* And the blue car was moving from west to east, I think you said?

"*A.* The car was moving across the intersection, on a left turn.

"*Q.* I wonder if you could tell us how far in front of your scout car that blue car was when you first saw it?

"*A.* I would say approximately 10 to 15 feet.

"*Q.* So of your own knowledge and your own observations, you don't know that the blue car had been traveling south on Miller and made a left turn in front of you?

"*A.* I didn't see the car coming. south on Miller, no.

"*Q.* That is your deduction, not your observation, is that right?

"*A.* That is my—yes, my deduction."

The testimony of the other police officer indicated that he was not concerning himself with the operation of the police car. Apparently his observations were general in nature, and immediately before the collision occurred he had been looking to the east. He did not notice defendant's car until it was immediately in front of plaintiff's vehicle and proceeding in an easterly direction. He was unable to testify as to the speed of either vehicle.

In stressing their claim as to defendant's conduct, counsel for appellant call attention to CLS 1956, § 257.650 (Stat Ann 1952 Rev § 9.2350), which reads as follows:

"The driver of a vehicle within an intersection intending to turn to the left shall yield the right-of-way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but said driver, having so yielded and having given a signal when and as required by this chapter, may make such left turn and the drivers of all other vehicles approaching the intersection from said opposite direction shall yield the right-of-way to the vehicle making the left turn: Provided, That at an intersection at which a traffic signal is located, a driver intending to make a left turn shall permit vehicles bound straight through in the opposite direction which are awaiting a go signal to pass through the intersection before making the turn."

The interpretation of the above section was considered in *Neander* v. *Clampett,* 344 Mich 292, 295, where it was said:

"Next, plaintiff says that the court erred in charging that after defendant entered the intersection he was required to yield to vehicles approach-

ing from the opposite direction, which were either in or near the intersection, and to give the appropriate signal, and that then he might proceed to turn left and that other vehicles approaching from the opposite direction at a greater distance were then required to yield the right-of-way to defendant. The instruction was in accord with CLS 1954, § 257.650 (Stat Ann 1952 Rev § 9.2350), and was not in error. Plaintiff's contention that it was improperly given appears to stem from her position that the law required defendant, after entering the intersection under a favorable green light, to stop and wait for a change in the traffic light before completing the left turn. We are cited to no statutory or ordinance authority for that view."

Plaintiff's argument undertakes to assume that defendant was guilty of violating the statute. In view of the fact, however, that the police car was at least 150 feet south of the intersection when the light turned, and in the absence of proof as to the precise location of defendant's automobile at the time, the propriety of the assumption is open to question. Apparently plaintiff relies to some extent on an ordinance of the city which was not pleaded or offered in evidence in the case. However, the circuit judge entered judgment for defendant on the ground that plaintiff had not established the freedom of its driver from contributory negligence, such finding being based on plaintiff's proofs indicating that either the driver of the police car had not made observations for other traffic that might enter the intersection ahead of him, or that he had failed to see defendant's automobile at any time prior to the instant of the impact.

Plaintiff's employee owed the duty of making proper observations for other traffic as he approached and entered the intersection. There was nothing to prevent the observance of such duty and

the exercise of reasonable precautions in driving through the intersection. It must be assumed that he had in mind the rights of other drivers to use the intersection. We think the testimony on which the judgment was based clearly supported the factual findings of the circuit judge. The testimony of plaintiff's driver, above set forth at some length, clearly indicates the situation that existed. The facts here involved are not analogous to the situation shown in *Travis* v. *Eisenlord,* 256 Mich 264.

In view of the conclusion reached on the main question at issue, it becomes unnecessary to consider the effect of plaintiff's failure to offer proof of damages on the trial in circuit court. The parties are apparently in accord that in the municipal court trial there was a stipulation as to the amount of recovery if plaintiff was found entitled to damages. As suggested, however, the effect, if any, to be given such stipulation in circuit court does not require determination.

The judgment entered in circuit court is affirmed. Defendant may have costs.

Dethmers, C. J., and Kelly, J., concurred with Carr, J.

Black, J. (*concurring in affirmance*). This negligence case was tried to the court without a jury. The trial judge's finding of fact, viewed either that plaintiff had failed to disprove contributory fault or—affirmatively—that plaintiff was guilty of such fault, and his consequent ruling that defendant on the whole record was entitled to judgment in his favor, are supported by substantial proof and inference from proof the trier of facts was entitled to accept or reject. The finding is thus legally equivalent to a jury verdict for defendant had the case been jury-tried according to instructions based on

*Travis* v. *Eisenlord,* 256 Mich 264 and *Barron* v. *City of Detroit,* 348 Mich 213.

We have recently considered our limited function when the appellant—reviewing by authority of Court Rule No 64 (1945)—insists in the language of the court rule "that the judgment is against the preponderance of the evidence" (*Schneider* v. *Pomerville,* 348 Mich 49; *Northwest Auto Co.* v. *Mulligan Lincoln-Mercury, Inc.,* 348 Mich 279; *Barnes* v. *Beck,* 348 Mich 286). This Court does not reverse or remand on bid of such an assignment in the absence of convincing proof that the trial judge has overlooked or ignored, and thus has not tested, crucial or decisive proof. There are 2 reasons for our continued adherence to this oft-declared rule in law cases tried to the court and reviewed here. One is that this Court sits as an appellate tribunal. The other is the comparably better position of judgment a trial judge occupies when it comes to judging and appraising the testimony of witnesses. He sees and hears (and sometimes reads), whereas we read only. For elaboration, see *Hayes Construction Company* v. *Silverthorn,* 343 Mich 421, 428, 429.

Here, granting that Officer Monberg had the right-of-way over defendant by permission and command of the intersectional traffic control signals, Monberg nevertheless did not see the defendant's car until the latter approached (from Monberg's left) and had nearly cleared the intended path of the car Monberg was driving. This fact, duly found by Judge Weideman, indicates a complete failure of lookout ahead on the part of the officer. It therefore furnished ample evidentiary support for the judge's ruling "that plaintiff had not established the freedom of its driver from contributory negligence" (quotation from Mr. Justice CARR's opinion, *ante,* p 107).

Viewing as we do the finding in such light, and there being no remaining reviewable question, our

appellate duty in this case would ordinarily end. Nevertheless, and since the question hangs—like the second shoe in the overhead apartment at midnight —in apprehensive balance, I would go on and question with purposeful intent the wisdom and sense of Michigan's continued adherence to what is known in most trial offices as the dual burden of proof in negligence cases.

Dean Green, of the school of law of Northwestern university, wrote the nub of today's thought and purpose this way:

"With almost unanimity in Anglo-American jurisdictions contributory negligence is held to be a matter of defense, with the burden on the defendant to plead the defense and sustain it by a preponderance of the evidence. The courts which in the beginning made the same mistake as did the supreme court of Illinois in placing the burden on the plaintiff, have corrected the mistake either partially or altogether or have had it corrected for them by legislation. When done by legislation the job has seldom been a thorough one. Illinois stands alone in the severity with which its courts place the burden on the plaintiff.*

"Why should a plaintiff be required to purge himself of fault before he can maintain an action against a negligent defendant? It is sometimes said that no other rule is logical inasmuch as a claimant should not be permitted to recover until he shows that he himself did not contribute to his own injury. This argument, of course, begs the question. It assumes the point at issue. It is equally logical to say that a defendant, a conceded wrongdoer himself who seeks to escape by throwing the whole loss on the

---

* This, I respectfully suggest, isn't quite true. Michigan, until today, has yielded first place to no State in harsh application of the unorthodox rule. Vermont, one of the few (if not the sole) hold-outs with Illinois, qualifies her stand by holding that "although such burden was on the plaintiff, direct and affirmative proof of due care was not required." (*Smith* v. *Grove,* 119 Vt 106, 110 [119 A2d 880]; *Frenier* v. *Brown,* 116 Vt 538 [80 A2d 524].)

plaintiff, should be compelled to establish the plaintiff's wrongdoing. Logical deduction has no validity until the premises are agreed upon, and here it is the premises that are in question. The allocation of the onus of pleading and proof is generally conceded to be based on what is fair to the parties and convenient to administration by the courts. On these premises the almost unanimous opinion is that contributory negligence is a defense to be pleaded and supported by the defendant." (39 Illinois L Rev, 1944-1945, pp 116, 125, 126).

The quiddity of Michigan's continued attachment to this wholly discredited doctrine*—of dual burden in negligence cases—is no new subject of discussion among lawyers and judges of our State. As in the instance of Michigan's last stand on the hills of imputed negligence (compare Chief Justice Mc-Donald's dissent in *Lachow* v. *Kimmich,* 263 Mich 1 [90 ALR 626, 32 NCCA 579], with *Bricker* v. *Green,* 313 Mich 218 [163 ALR 697]), current approach follows rather than precedes fair debate and professional ventilation. In the one instance our ultimate confessional in *Bricker* was preceded by Mr. Planck's forceful thesis, "Michigan Stands Alone" (22 MS BJ [January, 1943] 15). In the other, by a paper read and discussed at length during the March, 1955 State Bar Legal Institute at Saginaw,† and by Mr. Justice SMITH's recent opinion in *Sun Oil Company* v. *Seamon,* 349 Mich 387, 404, 405, precedent debate and argument have been duly afforded. Shall we move, or shall we keep on passing the buck to the legislature, in this purely adjective and judge-made field of the law of evidence? I view the duty as our

---

* The prevailing rule is known as the "orthodox" one. The one renounced by this opinion is the opposite—unorthodox. (9 Wigmore on Evidence [3d ed], § 2507, pp 372, 373).

† This paper was headed: "In Other States The Defendant, Not The Plaintiff, Bears The Burden Of Proof Respecting Contributory Negligence. Should Michigan Conform?"

.own. If, in the fullness of experience, it is found (and so it appears in this instance) that a rule of procedure or rule of evidence should be changed or amended, the judiciary becomes guilty of continuant fault when it sits in lethargy and leaves to the legislature a duty resting primarily on its shoulders.*

Mr. Justice Holmes, commenting on "The Path of the Law," leads the thought-way here. He said (Collected Legal Papers, Oliver Wendell Holmes, p 187):

"It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past."

The late and distinguished Judge Frank (of the 2d Federal judicial circuit) follows the path of Holmes this way:

"Especially are professional or other groups of specialists addicted to set ways. Even the natural scientists, presumably inspired by the spirit of intellectual adventuring, are by no means free of stick-in-the-mudism. The medical profession is almost as much precedent-ridden as the legal. Partly such devotion to past ways involves a sort of ancestor-worship; veneration for one's predecessors is often

---

* "The judicial function constitutionally empowers *the courts to make their own rules of procedure*, including rules of evidence (subject only to specific constitutional limitations). Virtually all of the original rules of evidence were invented by the courts. But as the courts usually failed to change rules which proved undesirable, the legislature from time to time made reformatory alterations by statute,—thus obscuring historically the natural function of the courts.

"In recent times, the just prerogative of the courts to make their own rules of procedure has been vindicated in professional opinion; and a healthy movement to relegate, generally, procedure to the courts has long been under way. That this prerogative of the courts includes the power to formulate and to alter the rules of. evidence ought not to be doubted." (1 Wigmore on Evidence [3d ed], 1957 Cum Supp, p 46, adding this quotation to text.)

given as a reason for sticking to precedents. Partly it involves pride: Judges, like doctors and others, are reluctant to admit they made mistakes. *Then, too, there is plain old-fashioned animal laziness. It's a nuisance to revise what you have once settled.* Out of such laziness comes what Holmes called 'one of the misfortunes of the law,' that 'ideas become encysted in phrases and thereafter for a long time cease to provoke further analysis.' " (Courts On Trial, by Jerome Frank, Princeton University Press, 1950, pp 272, 273).

Mr. Justice Voelker, writing to the point in *Van Dorpel* v. *Haven-Busch Company,* 350 Mich 135, 146, squarely laid the corrective responsibility at our door in these words:

"We reject as both un-Christian and legally unsound the hopeless doctrine that this Court is shackled and helpless to redeem itself from its own original sin, however or by whomever long condoned."

In the words of Holmes this rule of dual burden is quite revolting for reasons unanimously given by all modern authorities,* and I, at least, refuse to blindly imitate its dead past even though it becomes a nuisance to acknowledge and correct the error thereof. We are out of step for no good reason and by these presents I would move to the cadenced music of the legal times.

"*Stare decisis* is not, like the rule of *res judicata,* a universal, inexorable command. 'The rule of *stare decisis,* though one tending to consistency and uniformity of decision, is not inflexible. Whether it shall be followed or departed from is a question entirely within the discretion of the court, which is

---

* See 2 Restatement, Torts, § 477, p 1250; cases collected in notes, 9 Wigmore on Evidence (3d ed), § 2507, pp 373–375 and notes under § 2507 in 1957 Cum Supp; 38 Am Jur, Negligence, § 286, pp 977–979; and Mr. Justice Smith in *Sun Oil, supra.*

again called upon to consider a question once decided.' *Hertz* v. *Woodman,* 218 US 205, 212, 30 S Ct 621, 54 L ed 1001). * * * The court bows to the lessons of experience and the force of better reasoning, recognizing that the process of trial and error, so fruitful in the physical sciences, is appropriate also in the judicial function." (Mr. Justice Brandeis in *Burnet* v. *Coronado Oil & Gas Co.,* 285 US 393, 405–408 [52 S Ct 443, 76 L ed 815].)

Mr. Justice Wheeler, writer in 1915 of an honored and oft-quoted passage of dissent (*Dwy* v. *Connecticut Co.,* 89 Conn 74, 99 [92 A 883, 891, LRA 1915E, 800, Ann Cas 1918D, 270]), which passage Mr. Justice Cardozo called into play in making his deathless point-ultimate anent *stare decisis,*\* disagreed again (1930) with his colleagues in *Kotler* v. *Lalley,* 112 Conn 86, 100, 101, 103 (151 A 433, 438, 439),† this time with respect to the duty of his court to abolish the outmoded and wholly unsupported rule that the plaintiff bears the burden of disproving contributory fault.‡ * * * He said, in *Kotler:*

"The rule requiring a plaintiff to prove his own freedom from negligence in case of an injury done to him by a defendant imposed upon the plaintiff a negative burden, which is seldom or never required in other actions. From a legal point of view no one has ever succeeded in supporting this anomaly

---

\* "There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years." (For the complete and extended quotation, from which this sentence was taken, including Justice Cardozo's quotation from *Dwy,* see "The Nature of the Judicial Process," pp 151, 152; *Bricker* v. *Green,* 313 Mich 218, 234, 235 [163 ALR 697]; and *Van Dorpel* v. *Haven-Busch Company,* 350 Mich 135, 150.)

† All members of the court, signing in *Kotler,* agreed that the unorthodox rule "is an unjust one." (See pp 434 and 438 of *Kotler's* report, Atlantic citation, pp 90 and 112 of Conn citation.)

‡ Connecticut later moved to the orthodox rule by statute. See *Stabile* v. *D. & N. Transportation Co.,* 129 Conn 11 (26 A2d 12).

in our jurisprudence in a convincing way. The rule had been repudiated by decision or statute in most of the States and by the Federal courts at the time (1913) that Shearman and Redfield issued the latest edition of their work on negligence, in which, in section 109, the authors say: 'The weight of authority in support of the rule that the burden of proof of contributory negligence is upon the defendant is now so completely overwhelming that we omit most of our own argument in its favor, contained in earlier editions, when a majority of decisions were the other way. We then stated that our own view of the question agreed entirely with that expressed by the late Judge Duer. *Johnson v. Hudson River R. Co.,* 5 Duer (12 NY Super) 21. That able judge held negligence on the part of the plaintiff to be a mere matter of defense to be proved affirmatively by the defendant, although it might, of course, be inferred from the circumstances proved by the plaintiff. * * * When only 10 States out of 45 adhere to a rule condemned by the supreme court of the United States, it would be a waste of time to discuss the question further.' * * *

"The common law, which is the governing force of our life, is the product of slow and measured growth.

"Legislation does not know its established methods and has not its flexibility and capacity for adaptation.

"It is a grave error for a court to delegate to the legislature the duty which is knocking loud at its door."

I agree with these sentiments and, without further working over of past judicial stasis, move to adopt for guidance of bench and bar the following comprehensive rules appearing in 38 Am Jur, Negligence, § 286, pp 977–979 as follows:

"The doctrine that contributory negligence is not a part of the plaintiff's cause of action, but is a defense to be alleged and proved like any other defense, is maintained in by far the greater number

of States in this country. All that the plaintiff has to do in the first instance is to make out a prima facie case of negligence against the defendant. In these jurisdictions, contributory negligence is considered to be a defense in the nature of a confession and avoidance. Standing alone, it necessarily admits that the plaintiff was injured by the negligence of the defendant. It is said to be an affirmative defense. Like any other defense of an affirmative character, the burden is upon the defendant to establish it to the reasonable satisfaction of the jury. It must be made out by showing affirmatively not only that the plaintiff was guilty of negligence, but that such negligence cooperated with the negligence of the defendant to produce the injury. However, a defendant having the burden of proving contributory negligence may avail himself of any evidence supplied by the plaintiff on the issue. The rule as to proving contributory negligence is often stated to be that the burden is on the defendant unless the plaintiff's own evidence establishes it. It is said that the reason of the rule ceases, and it can have no application, when the plaintiff, by his own evidence, shows negligence on his part, and that such negligence aided or contributed to the injury received. By such evidence he establishes a defense to his own action as much as if the same facts were proved by the defendant;"

and in 2 Restatement, Torts, § 477, pp 1250, 1251; *viz.:*

"If the plaintiff makes out a prima facie case, the defendant, if he relies upon the plaintiff's contributory negligence, must prove it. However, this does not necessarily mean that the defendant must produce evidence to this effect. The plaintiff's own evidence may so clearly show him guilty of contributory negligence as to require the trial court to direct a verdict for the defendant or may be such that the jury would be warranted in finding for him. Indeed, it frequently happens that in proving the circum-

stances which show the defendant's prima facie liability the plaintiff is compelled to go so fully into the whole matter as to require the court or permit the jury to find him guilty of contributory negligence. If the evidence is such as to make the plaintiff's contributory negligence a question for the jury, the court on proper request will instruct the jury that they must render a verdict for the plaintiff unless they find from a preponderance of all the evidence, whether produced by the defendant or by the plaintiff or by both, that the plaintiff was guilty of negligence which contributed to his injury."

There is no need for extended review of the long line of Michigan cases standing at war with the orthodox rule I now would make effective in the peninsular State. All language supporting the unorthodox rule, contained therein, should be overruled.

I concur in affirmance, with costs to defendant.

Supplement (June 11, 1958):

The foregoing opinion was distributed to and for consideration of our Brothers on March 11, 1958. In the interim and on impetus thereof we have adopted new section 3a of Court Rule No 23* and Mr. Justice EDWARDS has written in the case by opinion dated May 14, 1958. Since section 3a has now gone into effect, the undersigned deem it inadvisable that the opinion of March 11th—containing as it does the intended "ground rules" of said section 3a—be withheld further from bench and bar. That opinion

---

* "Sec. 3a. In all negligence cases tried after the effective date hereof, the contributory negligence of the plaintiff shall be deemed to be a matter of affirmative defense to be pleaded and proved by defendants.

"In cases pending as of the effective date of this rule, amendments to pleadings to conform to its provisions shall be granted on motion filed prior to trial.

"This rule shall become effective as of the 1st day of June, 1958." (Adopted April 14, 1958.) See 352 Mich xiv.

with this supplement will therefore be filed in the clerk's office this day.

Mr. Justice EDWARDS writes that "the issue of burden of proof on the question of contributory negligence" is not before us. With due respect, we disagree. Every time this Court has assumed in past years to apply the rule of dual burden in negligence cases—on inspiration of raised and saved question or otherwise—the issue of worth and continued applicability of that evidentiary rule was then and there starkly before it. So it is here, as witness the opinion of Mr. Justice CARR. Thus, and as is made clear in the foregoing opinion, the responsibility for corrective action has steadily remained ours. That responsibility was finally recognized April 14th, in this year 1958, when section 3a was unanimously adopted on the Court's motion.

There is no hard and fast rule that appellate courts, sitting either in law or equity, cannot and, hence, do not raise and decide important questions *sua sponte*. Indeed, a mere glance at available precedent will disclose the contrary.* True, the power is exercised sparingly and with full realization of the restrictions and limitations inherent in the employment thereof. Before us, however (in this case of Dearborn as in numberless earlier cases coming here), is a judge-invented legal monstrosity that should have been judge-destroyed many years ago. When Michigan finally stood apart and alone—with Illinois—from all others, the duty became imperative and thus was conceived in this case of Dearborn the action said section 3a now depicts in our reports.

---

* See Professor Campbell's thesis: "Extent to which courts of review will consider question not properly raised and preserved." (7 Wis L Rev 91); *Auditor General* v. *Bolt,* 147 Mich 283; *Thomas* v. *Morton Salt Co.,* 258 Mich 231. In *Thomas* this Court went so far as to raise and decide a question on which a circuit court judgment was *reversed—not affirmed.*

We would have the reason for that action duly recorded.

SMITH, VOELKER, and KAVANAGH, JJ., concurred with BLACK, J.

EDWARDS, J. (*concurring in result*). The facts in this matter have been amply recited by my Brothers. I concur in their result.

I refrain from signing Mr. Justice BLACK's opinion solely because the issue of burden of proof on the question of contributory negligence of the plaintiff was not presented or argued in the trial court or before this Court. Further, whether the issue be regarded as one of substance or one of procedure, the view of this Court thereon has been settled, in my opinion, by the Rule adopted unanimously April 14, 1958.*

---

\* "In all negligence cases tried after the effective date hereof, the contributory negligence of the plaintiff shall be deemed to be a matter of affirmative defense to be pleaded and proved by defendant.

"In cases pending as of the effective date of this rule, amendments to pleadings to conform to its provisions shall be granted on motion filed prior to trial.

"This rule shall become effective as of the 1st day of June, 1958." Court Rule No 23, § 3a. See 352 Mich xiv.